H. C. Broder v. Commissioner.
Broder v. Commissioner
Docket No. 102342.
United States Tax Court
1942 Tax Ct. Memo LEXIS 24; 1 T.C.M. (CCH) 278; T.C.M. (RIA) 42677; 12/21/1942
*24 Henry Meyers, Esq., 20th Floor, Dime Bank Bldg., Detroit, Mich., and Arthur S. Purdy, C.P.A., 3402 Barlum Tower, Detroit, Mich., for the petitioner. Melvin S. Huffaker, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner made several adjustments to the net income shown by petitioner's returns for the calendar years 1936 and 1937 and determined deficiencies in income tax in the respective amounts of $504.23 and $847.87. The petition challenges only the disallowance of a credit in each year of $1,200, claimed under section 25(b) (2) of the Revenue Act of 1936. The disallowance was based on the theory that petitioner's three minor sons were not dependent upon him for support. Respondent now concedes that his action was erroneous. (Cf. .) The other adjustments made by him are not questioned. In an amended answer filed on September 5, 1941, respondent makes claim for increased deficiencies in the respective amounts of $12,152.72 and $11,674.67 on the ground that the income of three trusts, created by petitioner on or about December 24, 1935, for the benefit of his wife and *25 three sons, should be included in his gross income. Petitioner, in a reply timely filed, admits many of the allegations of fact contained in the amended answer but denies that any part of the income of the trusts is taxable to him. Most of the basic facts are contained in a stipulation, filed by the parties at the hearing. They are all found to be as stipulated. Other facts set out in our findings are based upon the evidence. Briefly, the question is whether the income is taxable to petitioner; (a) under section 22(a); (b) under section 166; or (c) under section 167 of the Revenue Act of 1936. If not taxable to petitioner under one of these sections, is it taxable to him (d) under the rationale of . Findings of Fact Petitioner and his wife, both of whom were 37 years of age at the time the trusts hereinafter referred to were created, were the parents of three sons, 4, 8 and 10 years of age. The sons were living with their parents in Detroit, Michigan, and petitioner supported them and his wife from his own funds, both before and after the creation of the trusts. Petitioner and his wife filed separate returns of income *26 with the collector of internal revenue for the district of Michigan for the years 1936 and 1937, showing gross income as follows: 1936
1937
Petitioner
$42,176.21
$40,221.18
Celia M. Broder
15,500.00
15,330.00 $15,000 of the income reported by the wife for each year was shown to have been received by her from the three trusts hereinafter referred to. Returns were also filed by the wife, as "Mother of minor Taxpayer and Trustee of Trust from which Income is Derived," showing income from fiduciaries as follows: 1936
1937
Harry Meyers Broder
$5,710.00
$5,775.00
Nathan Brewster Broder
5,710.00
5,775.00
William Keidan Broder
5,710.00
5,775.00
As of February 4, 1927, petitioner and Max Freedman each owned an equal undivided one-half interest in 3400 shares of the Cook Coffee Company of Detroit, a Michigan corporation, and 70 shares of stock in the Cook Coffee Company of Akron, an Ohio corporation. Under date of February 4, 1927, petitioner and Freedman entered into an agreement defining their respective interests and their rights of control and management in such corporations, under the terms of which each party agreed not to sell, transfer or assign *27 such interest, or any part thereof, without first offering such interest to the other. Paragraph 2 of this agreement is as follows: 2. - That each of the said parties will henceforth cast his vote at any and all meetings of the said respective corporations, above named, and conduct himself in the business and the management of said Corporations, so that said party of the first part, HYMEN C. BRODER, shall have the sole and complete control of the management and conduct of the affairs of the said COOK COFFEE COMPANY of Detroit, Michigan, a Michigan Corporation, and that said party of the second part, MAX FREEDMAN, shall have the sole and complete control of the management and conduct of the affairs of the said COOK COFFEE COMPANY of Akron, Ohio, an Ohio Corporation; IT BEING THE INTENT OF THESE parties that the said HYMEN C. BRODER shall have exclusive control of the management of the affairs of the Michigan Corporation, and that MAX FREEDMAN shall have exclusive control of the management of the affairs of the Ohio Corporation, throughout the existence of the said Corporation. In order that petitioner should have such exclusive management and control of the Cook Coffee Company of *28 Detroit, Freedman constituted and appointed Broder as his attorney and agent to vote his stock in that company. He also granted irrevocably to petitioner all of the powers that he, Freedman, should possess if personally present at stockholders' meetings. In like manner, in order that Freedman should be assured exclusive management and control of the Ohio corporation, Broder, in turn, granted irrevocably to him all of the powers that he, Broder, should possess if personally present at stockholders' meetings of that corporation. The agreement also contained provisions that in the event of the death of either party, the survivor should purchase from the estate the full and entire interest of the deceased party according to the method of determining value set out therein. Paragraphs 5 and 6 of the agreement are as follows: 5. - IT IS EXPRESSLY AGREED by the parties hereto that they, and either of them, will not make or enter into any agreement or contract with others that would tend to amend, alter, rescind or abrogate the provisions thereof nor will they, or either of them, make any will, deed or gift, or other testamentary document in controversion [sic] of its terms. 6. - It is *29 hereby agreed that THIS AGREEMENT shall be binding upon the heirs, assigns, executors, administrators and representatives of each of the parties hereto. The J. Aron & Co., Inc. of New York, N.Y. had been supplying the Michigan and Ohio corporations with coffee and its management was desirous of acquiring an interest in those companies. In order that it might acquire such an interest, a three-way deal was worked out whereby a new corporation would be created to hold the stock of the Michigan and Ohio corporations as well as the Home Tea Company, the majority of the stock of which petitioner and Freedman also owned. The proposed new corporation was to have 15,000 shares of stock, 10,000 of which were to be exchanged for all of the capital stock of the Michigan and Ohio corporations, plus all of Broder's and Freedman's holdings in the Home Tea Company. The remaining 5,000 shares of stock of the proposed new corporation were to be held in the name of M. W. Feingold for and on behalf of J. Aron & Co., Inc., which was to pay therefor a cash consideration of $500,000. Pursuant to the above arrangement (and which was to be consummated before the J. Aron & Co., Inc. was to pay the said $500,000), *30 petitioner and Freedman agreed to work for the new company for a period of ten years. They also agreed that the new corporation would not create or issue bonds, notes, etc., to mature later than six months from date of issue. In addition, petitioner and Freedman agreed that neither of them would, during the ten-year period, sell, pledge or alienate title to such stock except from one to the other or to Feingold, without the written consent of Feingold. It was also agreed that the certificate of incorporation of the new corporation would contain a voting clause providing that no substantial part of any of the property of the corporation would be sold, leased or exchanged unless authorized by the affirmative vote of the holders of at least 75 percent of the stock and that the bylaws of the new corporation should contain a clause providing that dividends would not be declared and paid in excess of 30 percent of the net profits unless consented to by the holders of at least 75 percent of its issued and outstanding stock. In addition to the above provisions of the agreements petitioner and Freedman agreed that, in the event of incapacity or death of either of them, the one remaining must *31 purchase the share of the other. They also agreed with Feingold that, if either of them became incapacitated or died, the last to sever connections with the company must offer his then interest to Feingold. The agreements were duly executed and on January 2, 1929, the new corporation, Cook Grocery Co., was organized. Certificates totalling 9,800 shares of its stock were issued to petitioner and Freedman jointly and certificates totalling 5,000 shares were issued to Feingold. The remaining 200 shares were issued to Michael J. Kalasinski. On January 19, 1929, the corporation's name was changed to Cook Products Co.
Under date of January 19, 1929, an agreement was entered into between petitioner and Freedman in which it was stated that they desired to vote, and that they would vote, the stock as one unit. This agreement was still in effect on December 24, 1935, when the trusts, the income of which is in issue herein, were created. It provided, in substance, that if the parties were not in agreement, the stock should not be voted by either but should merely be recorded as present. A designated trust company was to be the "holder of the certificates" and, in the event it was notified *32 by either party that a disagreement existed, it was to notify both of them that each must, within 10 days, appoint an arbitrator, the two so appointed to select a third, which board, after hearing, should "make such determination as in their judgment will appear to be for the best interest of both." Petitioner and Freedman each deposited with the trustee resignations from the board of directors and from any office held and these resignations or any of them could be used if the arbitrators should so decide. Under the same date (January 19, 1929) petitioner and Freedman entered into an agreement containing provisions for the sale of the stock in the corporation from one to the other, under specified circumstances and conditions. This agreement was amended under date of April 26, 1929, and again under date of March 31, 1930. Under date of January 28, 1933 "by way of substitution" for the earlier agreements a new one was executed. It recited that the parties had deposited with a trust company, as trustee, 9,800 shares of Cook Products Corporation stock, "owned equally, share and share alike" by petitioner and Freedman; that in the event of the death of either his estate should "be obligated *33 to sell and the other shall be obligated to purchase the interest of the deceased in the stock deposited with the Trustee upon the following terms." The purchase price was to be $300,000, $25,000 proceeds of a life insurance policy issued jointly on the lives of the parties, the remaining $275,000 to be paid within ten years "in annual installments representing the amount of the dividends earned and paid" but in any event at the rate of $15,000 per annum. Provision was also made for adjustment of the agreed purchase price. Article III of the substituted agreement is as follows: III. To secure the payment of said purchase price, and the payment hereof is made compulsory on the part of the survivor, the entire stock, including the interest of the survivor therein, is hereby pledged, and upon demand of the representative of the deceased's estate, the Trustee may offer to sell the interest of the deceased after ninety (90) days' notice of default to J. Aron & Company, Inc., New York of 91 Wall Street, New York, at a price not less than the balance of the purchase price, such offer to the said J. Aron & Company, Inc., New York to be open for a period of sixty (60) days, and thereafter *34 may offer to sell the same in the manner prescribed by the laws of the State of Michigan for the sale of pledged personal property. The agreement also provided that in the event either party should desire to sever his connection with the corporation "and sell his stock therein, the said stock may not be pledged or hypothecated without the consent of the other, and may not be sold except to the other * * *". In the event either party should become incapacitated and be incapable of active participation in the business for a period of 24 consecutive months then he was required to sell and the other party was required to purchase. In the fall or early winter of 1935 petitioner and Freedman decided to set up certain trusts in favor of their wives and children. Under date of December 24, 1935, they wrote a letter to the Trust Company - which was also signed by J. Aron & Co., Inc. - requesting that the certificates for 9,800 shares of the Cook Products Co. stock held by it in trust under the agreements heretofore referred to, be "released temporarily" upon the conditions therein set out. Stated generally, the certificates were to be delivered to petitioner's brother-in-law, who was also *35 his attorney, and his receipt was to relieve the trust company of liability for safe keeping and deposit. He was then to cause the certificates to be surrendered to the corporation and new ones to be issued, which were to be "redeposited with * * * [the trust company] under the said agreements and an additional agreement between the same parties" as per an unsigned copy attached. Upon redeposit the trust company was to issue its acknowledgment that it was "holding said new certificates, subject to the terms and provisions of all of said agreements now deposited with" it and of the new agreement. The concluding sentence of the letter reads as follows: It is the understanding and agreement of the undersigned that the above transactions shall not operate in any way to modify or vitiate said agreements now in existence, above referred to, but that the same shall remain in full force and effect according to the terms and provisions thereof, subject only to such modification as is contained in the said new agreement. On the same date (December 24, 1935) an agreement between petitioner and Freedman was signed, reciting the existence of the various agreements heretofore referred to and *36 the deposit of the stock with the trust company. This agreement contained, inter alia, the following provisions: WHEREAS. the parties desire to set up certain trusts in favor of their wives and children, hereinafter referred to as the Proposed Private Trusts, the corpus of said Trusts to consist of a portion of the shares of stock of said corporation owned by the parties, which shares are now on deposit with the Equitable Trust company, Trustee under the said Stock Sale and Voting Trust Agreements, and WHEREAS. it is necessary in order to establish said Trust Agreements that certain of said shares of stock so deposited shall be released by said Trustee for the purpose of reissue and redeposit with said Trustee under said agreements. and WHEREAS. it is the mutual desire of the parties to permit each other to do all things necessary to accomplish the establishment of said proposed Private Trust Agreements. provided that none of their rights under said Stock Sale and Voting Trust Agreements shall in any wise be limited, modified, altered or changed, and the parties have come to a mutual understanding and agreement and are desirous of reducing the same to writing. NOW THEREFORE. *37 in consideration of the mutual benefits to the parties and of the mutual covenants and agreements hereinafter contained, the parties hereto hereby covenant and agree: ONE: Solely for the purpose of reissue and redeposit with the Equitable Trust Company of Detroit as Trustee under the Stock Sale and Voting Trust Agreements aforesaid, said Trustee shall deliver to Henry Meyers, 2024 Dime Bank Building, Detroit, Michigan, the following certificates of stock of Cook Grocery Corporation, now Cook Products Corporation: (enumerating them) and upon obtaining the receipt of said Henry Meyers therefor, it shall be fully and completely relieved of liability for the safekeeping and redeposit of said certificates. TWO: Said Henry Meyers, acting as Escrow Agent, of the parties, shall cause said certificates to be surrendered to the Secretary of the Cook Products Corporation for reissue as follows: The parties agree that said ninety-eight hundred (9800) shares of stock are owned jointly by them in equal proportion and that said certificates, listed above, shall be reissued into the following certificates: [9 certificates for 300 shares to petitioner's wife as trustee for herself and her three *38 sons (3 certificates for each trust), a total of 2700 shares, other certificates to Freedman's wife as trustee for herself and children, a total of 2415 shares and the remainder to petitioner (2200 shares) and to Freedman (2485 shares), a total of 9800.] THREE: Said Henry Meyers, acting as Agent aforesaid, shall thereafter cause said reissued stock to be endorsed in blank and to be redeposited with the Equitable Trust Company of Detroit, as Trustee, under the terms of said Stock Sale and Voting Trust Agreements, and this agreement. FOUR: The parties further agree that from time to time said shares of stock held in said proposed Private Trusts may be transferred to a new Trustee or Trustees as the terms of said Indentures may require, provided, however, that nothing herein and no such transfer shall operate to release said stock from the operation of the Voting Trust Agreement, but such stock upon transfer to such new Trustee or Trustees shall be redeposited forthwith with the Equitable Trust Company of Detroit. Trustee under said agreements and this agreement, or with the Trustee then acting. FIVE: The right to modify, amend, extend, renew or terminate the aforesaid Stock Sale *39 and Voting Trust Agreements and this agreement shall at all times be vested solely in the parties hereto. All Cook Products Corporation stock now or hereafter placed in said proposed Private Trusts shall be subject to the terms and conditions of said Stock Sale and Voting Trust Agreements and this agreement at all times. The Trustees of said proposed Private Trusts shall accept such trusts upon the express understanding that neither the Trustees in said proposed Private Trusts nor the beneficiaries, nor any other person, except the parties hereto and/or their legal representatives shall, at any time, have the right to determine any procedure or to exercise any of the rights, options or privileges conferred by said Stock Sale and Voting Trust Agreements. For the purposes of said Stock Sale and Voting Trust Agreements and any modifications or amendments thereof all of the shares of Cook stock now or hereafter deposited therein shall be subject to the rights and obligations of the parties to this Agreement and/or their legal representatives, in accordance with the provisions of all of said agreements, including this agreement. By way of illustration, and not by way of limitation rights *40 and/or duties to vote, buy or sell Cook stock, as set forth in said agreements and herein, shall apply to all stock now or hereafter deposited under said agreements and this agreement, as though it were the original stock deposited by the parties and the parties shall be entitled to deal with said stock for the purposes of said agreements (including this agreement) as though it consisted of one single block issued in the joint names of the parties and owned equally by them. Under date of December 24, 1935, petitioner, as donor, and his wife as trustee, signed three trust instruments, identical in form and differing only in the name of the son and in the description of the shares of stock of the Cook Products Corporation, reciting that three certificates for 300 shares each had been granted, bargained, sold, assigned and transferred to the Trustee. Each instrument recited that the stock had been issued in the name of the Trustee * * * but is subject to certain agreements and indentures wherein Hyman C. Broder is party of the first part and Max Freedman is party of the second part, which agreements are dated * * * [as shown above]. The trustee was to hold the property for the uses *41 and purposes thereinafter set out but was to "forthwith deposit said certificates of stock * * * with the Equitable Trust Company of Detroit, as Trustee under the agreements above set forth." After payment of costs, charges and expenses she was to pay "the income annually to, or expend for the benefit of, or hold said net income, for the following named persons and uses:" ($3,000 for the named sons and $5,000 for the wife, the balance either to be paid to or for the benefit of the son or the wife or to be added to the corpus.) Under Article II of the trust the trustee was given general power to sell or exchange the property, to retain the securities without liability for depreciation, to determine whether money or property coming into her possession be treated as principal or income, to make advances, borrow money or repay advances, to compromise, compound and adjust claims and to enter into agreements from time to time with reference to reorganization, merger or consolidation of corporations. The last mentioned power (sec. 6 of Article II) is * * * subject to the provisions of the various agreements hereinabove mentioned as respects the stock of the Cook Products Corporation held *42 in this Trust. Articles III, IV and V of the Trust Instrument are as follows: III. It is the intent hereof to make this Trust, and the gift of the property trusteed, absolute and irrevocable and for that purpose it is declared specifically that any sale of trusteed property shall be in good faith and for full consideration. All rights and powers to amend, modify, or revoke this Trust, in whole or in part, are hereby expressly surrendered. The sale of trusteed property or any portion thereof is subject, however, to the agreements now outstanding, made and entered into by the Donor, as Party of the First Part, and Max Freedman of Cleveland, Ohio, as Party of the Second Part, dated: January 19, 1929; April 26, 1929; March 31, 1930; January 28, 1933 and December 24, 1935. The execution of this Indenture has been consented to by the said Max Freedman in an agreement made contemporaneously herewith and this Indenture and Trust are made subject to the terms of such agreement, dated December 24, 1935, a copy of which is hereto annexed. If the present corpus of the trust, or any portion thereof shall be sold at a price in excess of Sixty ($60.00) Dollars per share, (the value of each *43 share of stock at the date hereof) such excess, if any, shall be divided in the following manner: (a) One-half (1/2) hereof shall be paid to the wife of the Donor, if living. (b) The other one-half (1/2) shall be added to and become part of the corpus of the trust. (c) If such sale is consummated after the death of the wife, the one-half (1/2) of such excess referred to in clause (a) above shall be added to and become part of the corpus of the trust. V. The Trust hereby created shall terminate on the death of the Donor, provided: (a) Celia M. Broder shall have died, and (b) The son, Harry Meyers Broder, shall have reached the age of forty (40) years. If, upon the death of the Donor, both of the foregoing conditions do not exist, the Trustee [sic] shall nevertheless continue, in whole or in part as hereinafter set forth until both of the foregoing conditions have been met. If both the Donor and the wife shall be dead at the time the son reaches the age of thirty (30) years, this Trust shall cease and terminate as to one-third (1/3) of the corpus of the trust estate, and said one-third (1/3) shall be delivered to the said son; and when he shall reach the age of thirty-five (35) *44 years, an additional one-half (1/2) of the remainder of the corpus of the trust shall be delivered to the said Son; and when he shall reach the age of forty (40) years, the remainder of the corpus of the trust shall be delivered to the said son, and this trust shall terminate. Should the son predecease the Donor and the wife, the interest, right and title of the said Son shall pass to the person or persons entitled thereto under his will, or if there be no will, to the person or persons entitled to share in his intestate personal estate, and shall be so distributed upon the death of the wife, and this Trust shall thereupon terminate. Should the son survive the donor and the wife and thereafter die, but before reaching the age of forty (40) years, the Trust shall terminate and the entire estate be paid over to the persons entitled thereto under his will, or if there be no will to the persons entitled to share in his intestate personal estate. Article VI makes it definite that the rule against perpetuities is not being violated and Article VII gives the donor the right to add to the trust property. Under Article VIII certain spendthrift provisions are set out. Articles IX, X and *45 XI are as follows: IX. The Donor expressly retains the right, during his lifetime, to terminate the foregoing Trust made for the benefit of the beneficiaries, provided that if he so does, the title to all property and accumulations in the Trust shall forthwith vest in the son, subject only to the Trust created for the benefit of the wife. After the death of the Donor, the right of terminating this Trust, as to the son, subject to the interest of the wife, shall be vested in the Trustee hereunder. X. The Donor, as donor, shall not have the right to designate any successor trustee hereunder; but the Trustee and any successor may designate his or her successor, as the case may be by an instrument in writing or by Last Will and Testament. A trustee may designate, instead of one trustee, an Individual Trustee and a Corporate Trustee, who shall act as joint trustees and thereafter there shall always be an Individual Trustee and a Corporate Trustee. The Individual Trustee shall at all times have the right, in his sole discretion, with or without cause, to remove said Corporate Trustee by appointing a successor-corporate trustee. XI. Any payment or distribution by the Trustee hereunder *46 to or for the benefit of a minor may be made to a parent or guardian of the minor and the receipt of such parent or guardian shall fully protect the Trustee. The word "Trustee" when used herein shall be deemed to include not only the original Trustee hereunder, but also any successor trustee or trustees, individual or corporate, appointed and acting hereunder. Freedman, in like manner, created three trusts for the benefit of his wife and children. At all times herein material, petitioner was president and a director, Freedman was vice-president and a director, and a nominee of J. Aron & Co., Inc. was secretary-treasurer and a director of the Cook Products Corporation. At all times here material, the Cook Products Corporation owned and held all of the stock of the following corporations, having officers and boards of directors as indicated below: COMPANY
BOARD OF DIRECTORS
Cook Coffee Company (Michigan)
H. C. Broder, President-Treasurer
Home Tea Company (Michigan)
Max Freedman, Secretary
Central Tea Company (Michigan)
Louis Blumberg, Vice-President
Max Freedman, President-Treasurer
Cook Coffee Company (Ohio)
Louis Blumberg, Vice-President
H. C. Broder, Secretary
Edward Ornstein, President
Cook Coffee Company (West Virginia)
H. C. Broder, Vice-President
Max Freedman, Secretary-Treasurer
Louis Blumberg, Director
*47 The first funds going into the trusts involved herein, were dividends of $6 per share on the Cook Products Corporation stock, which were paid on December 31, 1935. A gift tax return, covering the stock transferred to the three trusts, was filed by the petitioner for the year 1935, and a gift tax was paid in connection therewith. In each of the returns for the year 1935, filed by petitioner's wife as trustee for the sons, the sum of $115.39 was reported on line 6 as a loss "from partnerships, syndicates, pools, etc." The details of the transaction or transactions giving rise to the losses reported are not shown. The wife made some purchases and loans out of the income received by her as trustee, one transaction being with the husband of petitioner's sister. She also purchased some stocks in the name of "Broder Brothers", this designation being made by her of the transactions carried out for the benefit of her sons. She had very little experience in making investments and usually relied upon her husband's judgment because she had confidence in it and he would usually suggest the stock to be purchased. Opinion As stated at the outset the question is whether the income of the trust *48 may be included in petitioner's income under the provisions of section 22(a), section 166, or section 167 of the Revenue Act of 1936 [1] or under the rationale of *49 In , it was pointed out that the Supreme Court had "expressed its disapproval of the view expressed in , and similar cases, that the settlor is taxable on only so much of the trust income as is in fact used to discharge his parental obligation" and held that "* * * the possibility of the use of the income to relieve the grantor, pro tanto, of his parental obligation is sufficient to bring the entire income of these trusts for minors within the rule of attribution laid down in Douglas v. Willcuts." . The instant proceeding is not distinguishable on its facts. The trustee was to pay "the income to, or expend [it] for the benefit of" the named minor son and "Any payment or distribution * * * [could] be made to a parent or guardian." Under the spendthrift provisions the trustee was specifically authorized to use the minor's share of the income for his "maintenance, support, comfort and education." It is therefore immaterial that petitioner continued to support his children and did not actually use *50 any of the income for that purpose. The respondent's claim for an increased deficiency based upon the inclusion of all except $5,000 of the income of each trust in petitioner's income is therefore sustained. The controversy with reference to the portion of the income payable by the wife, as trustee, to herself cannot be disposed of so summarily. Upon brief respondent argues that petitioner retained such "substantial incidents of ownership with respect to the trust corpus and * * * of control over and interest in the disposition of trust income" as to make the entire income of the trusts taxable to him under section 22(a), supra. He also urges that the income is taxable to petitioner under section 166 because he retained an interest in the corpus of the trust and that it is taxable to him under section 167 because it is possible that some of the income might be used "for the payment of petitioner's own obligations." The parties do not discuss separately the taxability of the income payable to the wife; but in view of the conclusion reached in the preceding paragraph of this opinion it is necessary that we do so. In so far as the trusts were for the benefit of the children, conclusion *51 has been reached that the income must be included in petitioner's income. This leaves for consideration the provisions for the exclusive benefit of the wife. Although they were all contained in the same instruments it is possible, and indeed it seems to be necessary, to deal with them separately. The provisions for her exclusive benefit may therefore be briefly summarized. Reading the three trust instruments together it will be noted that petitioner gave to his wife, as trustee for herself, 2,700 shares of Cook Products Corporation stock. The stock was subject to the "stock sale" and "voting trust" agreements with Freedman, shown in the findings; but it is readily apparent that under them no powers or rights - except the limited right to participate with Freedman in voting them - were reserved by petitioner. In other words petitioner transferred to his wife, as trustee, every right, title, claim and interest in the stock which he had. Cf. ; , affirmed . She was thus authorized and enabled to collect *52 the dividends upon the stock as trustee and was directed to pay over to herself annually $15,000 of the income so realized. The trust was "absolute and irrevocable" and the income was to be paid to her as a beneficiary "for and during her life." Respondent's present contentions are substantially the same as those advanced in Suhr v. Commissioner, 126 Fed. (2) 283. They were all answered quite fully by the court and most of its statements and conclusions are apposite here. The case was recently cited by the Supreme Court in , as one "appraising the application of section 167 to cases where a wife is the trustee or beneficiary of the funds which may be used for the family benefit". It would serve no useful purpose to quote at length from the opinion of the court in the Suhr case or to summarize its reasoning. It is sufficient for present purposes to point out that Douglas v. Willcuts was held to be inapplicable where the taxpayer "continued to perform his statutory and moral duty apart from the trust distributions" and had not been relieved therefrom by the terms of the trusts; that section *53 167 should not be applied merely because the settlor's wife might possibly, at some time in the future, use some of the income for her support and maintenance; that the income is not taxable to the grantor under section 166 merely because he has reserved the right to receive the principal upon the death of the wife if he then be living, (cf. ; and that the income should not be held to be taxable to the grantor under section 22(a) unless the facts are substantially analogous to those before the court in . Respondent's comprehensive discussion of decided cases and of the terms of the trust has been given careful consideration, particularly his contention that petitioner would, if designated by his wife as successor trustee under Article X, possess substantially the same powers enjoyed by the settlor in the Clifford case. There is no reason to suppose that he will ever be so designated; but even if he were his powers over the trust property and its income would not be nearly so comprehensive as those possessed by Clifford. A few comparisons may be made. *54 Clifford's trust was for five years; petitioner's for life. On termination of the trust the entire corpus was to go to Clifford; here the corpus goes to the wife. Clifford had "absolute discretion" as to the portion of the income to be paid to his wife; the trustee here, even though it should be petitioner, must pay at least $15,000 annually ($5,000 under each trust) to the wife. "No one fact is normally decisive" and consideration must be given "to the whole nexus of relations between the settlor, the trustee and the beneficiary." . Such consideration has been given and conclusion has been reached that the income properly payable and paid to the wife as a beneficiary under the trust created by petitioner may not be included in his gross income. Respondent's claim for an increased deficiency based upon the inclusion in petitioner's income of the amount paid by the trustee to the wife is denied. Decision will be entered under Rule 50. Footnotes
1. SEC. 22. GROSS INCOME. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal services, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. In the case of Presidents of the United States and judges of courts of the United States taking office after June 6, 1932, the compensation received as such shall be included in gross income; and all Acts fixing the compensation of such Presidents and judges are hereby amended accordingly. SEC. 166. REVOCABLE TRUSTS. Where at any, time the power to revest in the grantor title to any part of the corpus of the trust is vested - (1) in the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom, or (2) in any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom, then the income of such part of the trust shall be included in computing the net income of the grantor. SEC. 167. INCOME FOR BENEFIT OF GRANTOR. (a) Where any part of the income of a trust - (1) is, or in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income may be, held or accumulated for future distribution to the grantor; or (2) may, in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income, be distributed to the grantor; or (3) is, or in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income may be, applied to the payment of premiums upon policies of insurance on the life of the grantor (except policies of insurance irrevocably payable for the purposes and in the manner specified in section 23 (o), relating to the so-called "charitable contribution" deduction); then such part of the income of the trust shall be included in computing the net income of the grantor. (b) As used in this section, the term "in the discretion of the grantor" means "in the discretion of the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of the part of the income in question."↩